O

NO JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARONDA GRAHAM, individually and as successor-in-interest; SHAR'RHONDA DAVIS, individually and as successor-in-interest; and DEBORAH JEFFERY, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF LOS ANGELES, DEPUTY GRIMES; DEPUTY RANIAG; DEPUTY AUSTIN, DEPUTY GRIFFITH, <br><br> Defendants. | Case No. CV 10-05059 DDP (Ex) <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Dkt. No. 48] |

Presently before the court is Defendants' Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment ("Motion"). After reviewing the parties' moving papers and hearing oral argument, the court grants the motion and adopts the following order.

///

///

I.  Background

   This action arises from the death of Raynard Davis ("Davis") following an encounter with Los Angeles County Sheriff's deputies, during which Davis was tased twice in the chest.  On July 4, 2009, Davis lost control of his vehicle and drove approximately one hundred yards off of a road in Lancaster, California.  When Los Angeles Sheriff's Department deputies and Los Angeles Fire Department paramedics and firefighters arrived on the scene of the accident, Davis was sitting in his car with swollen eyes and blood on his face.  (Opp. Ex. A at 30:17-18.)  Deputy John Griffith and the firefighters tried to get information from Davis, who was speaking incoherently and exhibiting erratic behavior.  (Mot. Ex. J at 29:19-22.)  Firefighters attempted to treat Davis in his car and prevent him from exiting the vehicle, and deputies verbally commanded Davis to stay in the car.  (Mot. Ex. I at 27:2-13.) Davis' behavior in the car was "combative."  (Opp. Ex. A at 29:16-19.)  Davis said "Leave me alone," and hit his hands against the car's steering wheel.  (Mot. Ex. M at 14:18-21.)  Then Davis, who weighed 440 pounds, pushed himself up to face the firefighters and Deputy Nathan Grimes, and exited the car.  (Declaration of Deputy Nathan Grimes in Support of Motion for Summary Judgment ("Grimes Decl.") ¶ 7.)

   After he got out of the car, it appeared to the firefighters and deputies that Davis was walking towards them in an "aggressive manner," as if Davis wanted to fight with them.  (Opp. Ex. C at 20:17-19; Opp. Ex. A at 48:14-17.)  Before he was tased, Davis said to the deputies "I am going to fuck you guys up" (Opp. Ex. A at 47:8-12) and "I'm gonna kick your ass."  (Declaration of Deputy

2

1  Kristoffer Ranaig in Support of Motion for Summary Judgment
2  ("Ranaig Decl.") ¶ 9.)  As Davis approached the firefighters and
3  Deputy Nathan Grimes, Grimes said "If you come any closer, I'm
4  gonna tase you." (Grimes Decl. ¶¶ 7-8.)  Davis, with fists
5  clenched, continued to approach.  (Opp. Ex. A at 51:12-14.)  Deputy
6  Grimes drew his taser, aimed at Davis, and fired.  Deputy Grimes
7  was the only deputy on the scene to draw his taser.  No order,
8  instruction, or request was given for any of the deputies to draw
9  their tasers.  Deputy Grimes deployed his taser in dart mode, and
10 the darts punctured Davis' left chest wall.  Davis removed the
11 darts and several deputies moved in to restrain him. The other
12 deputies struggled and had a difficult time handcuffing Davis, who
13 was resisting by separating his arms.  (Opp. Ex. C at 34:2-35:22.)
14 Deputy Grimes tased Davis a second time in order to get Davis to
15 cooperate with the other deputies.  (Grimes Decl. ¶ 10.)

16    Deputy Grimes contacted his supervisor, Sergeant Steve
17 Sylvies, to report the use of force.  Sergeant Sylvies later
18 arrived at the scene.  Once handcuffed, Davis continued to resist
19 treatment.  (Mot. Ex. H at 27:22-28:22.)  Firefighters eventually
20 carried Davis to the ambulance in a cargo net.  While being carried
21 by firefighters and paramedics, Davis kicked one of the
22 firefighters and had to be hobbled by Deputy Kristoffer Ranaig and
23 Deputy Griffith.  (Ranaig Decl. ¶ 14.)

24    Davis was then transported by ambulance to the emergency room
25 at Antelope Valley Hospital at about 10:15 p.m.  Davis continued to
26 thrash around and resist treatment, tried to spit on medical staff,
27 and continued to say "I'm going to fuck you all up." (Mot. Ex. R
28 at 18:24-19:3.)  Davis was placed in four-point restraints and a

                                3

spit mask, and medical staff then administered calming agents. Laboratory tests of Davis' blood and urine returned positive for cocaine metabolite, cannabinoids, and phencyclidine (PCP). Tests also showed blood alcohol levels of roughly 0.16 or 0.17 milligrams per deciliter.

At approximately 3:30 a.m., Davis' condition began to deteriorate. He died a few hours later at 7:09 a.m. on July 5, 2009.

On July 9, 2010, Davis' two daughters, Shar'Rhonda Davis and Caronda Graham, and his fiancée, Deborah Jeffrey (collectively, "Plaintiffs") filed a complaint against Deputy Grimes, Deputy Griffith, Deputy Raniag, Deputy Austin (collectively, the "Individual Defendants"), and the County of Los Angeles (collectively, "Defendants"). On December 8, 2010, Plaintiffs filed a First Amended Complaint ("FAC") asserting the following causes of action: (1) unreasonable search and seizure (detention and arrest), actionable under 42 U.S.C. § 1983; (2) unreasonable search and seizure (excessive force), actionable under 42 U.S.C. § 1983; (3) denial of medical care, actionable under 42 U.S.C. § 1983; (4) interference with familial relationship and association, actionable under 42 U.S.C. § 1983; (5) conspiracy to violate civil rights, actionable under 42 U.S.C. § 1983 and § 1985; (6) municipal and supervisory liability, actionable under 42 U.S.C. § 1983; (7) false arrest/false imprisonment; (8) battery; (9) negligence; and (10) violation of the Bane Act, California Civil Code § 51.7. Defendants now move for summary judgment.

///

///

**II.  Legal Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." <u>Id.</u>

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

It is not the Court's task "to scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. <u>Carmen v. San Francisco Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." <u>Id.</u>

## III. Discussion

### A. Plaintiffs' Non-opposition

Plaintiffs do not oppose Defendants' motion with respect to their first, third, fifth, and seventh claims. Accordingly, Defendants' motion for summary judgment is GRANTED with respect to those claims.

### B. Causation

Causation is an implicit requirement of a civil rights cause of action. <u>Arnold v. International Business Machines Corp.</u>, 637 F.2d 1350, 1355 (9th Cir. 1981). Here, Plaintiffs have put forth no evidence that any Defendant caused Davis' death or, therefore, Plaintiffs' individual injuries. Plaintiffs conclusorily state that the facts that Davis was tased and then died the next day "are more than enough for a reasonable inference to be drawn that one had something to do with the other." (Opp. at 31.) Plaintiffs argue that this inference "is supported by the testimony of the

medical examiner," who, Plaintiffs argue, "did not attribute the cause of death to drug intoxication." (Id.)

Plaintiffs' argument is unpersuasive. Plaintiffs have not submitted an expert report, and instead cite solely to the testimony of Dr. Pedro Ortiz-Colom, a medical examiner and forensic pathologist at the Coroner's Office for the County of Los Angeles. While Dr. Ortiz-Colom did not attribute the cause of Davis' death to drug intoxication, he did testify that drugs "contribute[d] significantly to [Davis'] death." (Opp. Ex. E at 62:5-6.) Dr. Ortiz-Colom further testified that Davis' death was caused by "drug induced excited delirium." (Id. at 62:8-9.) According to Dr. Ortiz-Colom, excited delirium is a condition "produced by overstimulation of the body systems usually under the influence of a drug or drugs." (Mot. Ex. T at 13:7-9.)

Dr. Ortiz-Colom's reports and testimony not only fail to support Plaintiffs' arguments, but also bolster Defendants' contention that the tasing was not a factor in Davis' death. Dr. Ortiz-Colom's coroner report on Davis states:

> Davis died of the complications of drug use and underlying contributing heart and liver disease. Review of the autopsy finding and medical records support the conclusion that the cause of death was due [to] a condition best described as Excited Delirium . . . In general the theory behind this condition is that there is an abnormal elevation and secretion of catecholamines triggered by the stimulating effects of the drug(s) in the body . . . Other significant contributing conditions include an enlarged heart and fatty liver. Both of these conditions can lead to sudden cardiac arrhythmias and metabolic disturbances. The medical derangements in combination with the drugs taken may have contributed to [Davis'] death.

(Mot., Ex. T.)

Dr. Ortiz-Colom further testified that he did not see "any indication of the tasing" nor "any evidence of tasing in the

7

autopsy." (Mot. Ex. T at 24:9-11.)  Furthermore, Dr. Ortiz Colom did not "find any evidence that the tasing had any effect on [Davis'] death." (Id. at 24:22-25.)  He did not think there was "any evidence that anybody including the police officers did something that was a contributing cause" to Davis' death. (Id. at 26:2-9.)  Dr. Ortiz-Colom also stated that there was no "evidence of a traumatic factor in the cause of death." (Id. at 42:21-24). Two additional experts, Drs. Fukumoto and Kroll, also testified that the use of a taser did not cause Davis' death. (Declaration of Richard Fukumoto, M.D. in Support of Mot. ¶ 12; Declaration of Mark Kroll in Support of Mot. at 6-12.)  Plaintiff has put forth no evidence to the contrary.  Plaintiffs have not presented any evidence that Defendants' conduct caused Davis' death.  Because Plaintiffs cannot establish the necessary element of causation, Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' individual claims.

    C.   Qualified Immunity

Defendants assert that they are entitled to qualified immunity against Plaintiffs' claims brought as Davis' successors in interest.  In evaluating a police officer's assertion of qualified immunity, the court asks two distinct questions. Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).  The court must determine whether officers' conduct violated a constitutional right and, if so, whether that right was clearly established. Id. The court may, in its discretion, address either prong of the analysis first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "If no constitutional right would have been violated were the allegations established, there is no necessity for further

inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989); Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001). Because excessive force cases often turn on credibility determinations, summary judgment in such cases is generally disfavored, particularly where police officer defendants are the only eyewitnesses and cross examination is the only means of contesting a defendant's version of events. Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (en banc); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). The court must determine whether a defendant's actions are "objectively reasonable," when viewed from the perspective of a reasonable officer on the scene. Graham, 490 U.S. at 396-397. This analysis requires a balancing of the intrusion on a person's liberty with the countervailing government interests at stake. City of Hemet, 394 F.3d at 701. Relevant factors include the type of force used, the severity of the crime that prompted the use of force, threats posed by the subject to the safety of others, and whether the suspect was resisting arrest. Tatum v. City and County of San Francisco, 441 F.3d 1090, 1095 (9th Cir. 2006).

Here, Plaintiffs' non-opposition to Defendants' motion with respect to the unlawful detention and false arrest causes of action suggests that the parties agree that, to the extent deputies detained or seized Davis in the course of obtaining medical treatment for him, there was a reasonable basis to do so. See also Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)

9

("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.").[1]

The fact that deputies had a reasonable basis to detain Davis, who was injured and incoherent after his car accident, does not, of course, alone render Deputy Grimes' use of a taser reasonable. A taser, when deployed in dart mode, is designed to deliver an electrical charge that overrides the central nervous system, rendering a target limp. See Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011) (en banc); See also Glenn v. Washington County, 673 F.3d 864, 877 (9th Cir. 2011) (Describing advantages of taser over more intrusive beanbag shotgun). The use of a taser dart therefore constitutes an "intermediate or medium, though not insignificant, quantum of force." Bryan, 630 F.3d 805 at 826.

A use of force of such magnitude may be warranted if the governmental interests at stake are sufficiently compelling. Here, Davis was a large, 440-pound man who appeared to be acting erratically. He ignored commands from both paramedics and deputies to remain in his vehicle while firefighters administered medical treatment. Davis began to act aggressively toward deputies and paramedics, slamming his hands against the steering wheel and saying "Leave me alone." Firefighters attempted to restrain Davis physically by pushing him down into the car seat, but were unable to do so.

---

[1] Though the "community caretaking" or "emergency doctrine" exception to the Fourth Amendment typically arises in the context of warrantless searches, courts in this circuit have extended the doctrine to warrantless arrests as well. See, e.g. Goldsmith v. Snohomish County, 558 F.Supp. 2d 1140, 1151-1152 (W.D. Wash. 2008).

10

Upon exiting the car, Davis began to threaten paramedics and deputies, stating "I am going to fuck you guys up." It appeared to paramedic Joe Carvalho that Davis was "coming after one of us . . . like he was coming after somebody." The uncontroverted evidence establishes that Deputy Grimes warned Davis that Davis needed to stop, and would be tased if he continued to advance on paramedics and deputies.[2] Davis continued to approach, with fists clenched. Only at that point, with a reasonable fear for the safety of deputies, paramedics, and indeed for Davis himself, did Deputy Grimes deploy a taser dart. (Mot. Ex. M at 24:18-25:3.) Deputy Grimes' use of a taser dart was objectively reasonable in light of the surrounding circumstances.

Deputy Grimes later tased Davis a second time. Though declining to specify the quantum of force associated with a taser applied in direct contact mode, the Ninth Circuit recently found such force less serious than a dart-mode tasering, albeit still extremely painful. <u>Mattos</u>, 661 F.3d at 443. Nevertheless, as with the initial tasering, Deputy Grimes' second use of the taser was reasonable in light of the totality of the circumstances. The intermediate-level taser darts did not appear to have a significant effect on Davis, and unquestionably failed to render

---

[2] Plaintiffs' counsel cites to the deposition of Deputy Austin in an attempt to create a material dispute regarding whether Deputy Grimes gave a warning before tasing Davis. Plaintiffs argue that Deputy Grimes fired his taser at Davis "without any warning." (Opp. at 8) Deputy Austin, however, never testified that Grimes did not give a warning. To the contrary, Deputy Austin testified that Grimes <u>did</u> warn Davis that he was on the verge of being tased. (Austin Depo., Ex. X at 50.) Plaintiffs omit this page of the relevant deposition, citing instead to Austin's statement that he did not describe Deputy Grimes' warning in the written police report.

11

him limp and helpless. (Grimes Decl. ¶ 9.) Davis continued to resist treatment and detention even after the initial tasing, and physically struggled against three deputies who were attempting to restrain him. (Mot. Ex. M at 34:2-9.)

Throughout the incident, Davis repeatedly yelled "I'm going to fuck you up." (Mot. Ex. M at 49-:13-20; Declaration of Deputy Mikeal Smith ¶ 11.) Only after the second tasing were deputies able to place Davis in handcuffs. Even then, Davis continued to violently resist detention and treatment, kicking a firefighter who was attempting to carry him to the ambulance. Deputies then took the reasonable precaution of hobbling him.[3] Only after medical staff, without the involvement of the defendant deputies, implemented more serious measures such as four-point restraints, a spit mask, and sedatives, did Davis finally cease resisting.

The use of a taser, particularly in dart mode, constitutes a significant use of force. Nevertheless, the governmental interests at stake here, including the safety of the responding deputies, paramedics, and Davis himself, outweigh the intrusion upon Davis' individual liberty. The record, including the testimony of responding officers, firefighters, paramedics, and hospital staff, establishes that Deputy Grimes' use of force was objectively reasonable in light of the surrounding circumstances. Accordingly, there was no constitutional violation, and the defendant deputies are entitled to qualified immunity.

D.  State Claims

---

[3] In any event, Plaintiffs' excessive force claims appear to be limited to the two tasings.

Having determined that there was no constitutional violation, and that Defendants' use of force was objectively reasonable, the court also GRANTS Defendants' motion for summary judgment on Plaintiffs' remaining state claims.

## IV. Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Dated: July 19, 2012

DEAN D. PREGERSON
United States District Judge